IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PROSYNTHESIS LABORATORIES, INC.,
   d/b/a Unjury Protein,

                    Plaintiff,

   v.

EUROFINS MICROBIOLOGY LABORATORIES, INC.,

                    Defendant.

OPINION AND ORDER

22-cv-655-slc

---

This lawsuit arises out of laboratory testing and analysis that defendant Eurofins Microbiology Laboratories, Inc. performed in 2022 on samples of protein powder produced by plaintiff Prosynthesis Laboratories, Inc. (d/b/a/ Unjury Protein). Unjury alleges that its product samples were contaminated at Eurofins's facility, which caused the samples to incorrectly tested positive for Salmonella, resulting in millions of dollars in damages. Unjury has asserted claims for negligence and violations of the Wisconsin Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.18. Before the court is Eurofins's motion to dismiss both claims under Fed. R. Civ. P. 12(b)(6). Dkt. 9.

Eurofins's motion relies heavily on terms and conditions that Unjury's president accepted in 2017, including a provision that Iowa law governs the construction, validity, and performance of the terms and conditions.[1] Although the agreement purports to cover all orders thereafter accepted by Eurofins, Unjury fails to discuss the agreement in its complaint and largely ignores it in its brief. Nonetheless, Unjury does not deny making the agreement, and it recognizes the agreement's effect on Unjury's claims: Unjury cites both Iowa and Wisconsin law in opposing

---

[1] Because the business relationship is specifically referenced in the complaint, and the terms of that relationship are central to Unjury's claims, this court may consider the parties' agreement without converting the motion to dismiss to a motion for summary judgment. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Unjury does not dispute Eurofins's argument to this effect.

Eurofins's challenges to its negligence claim and drops a footnote in its brief, requesting leave to amend its complaint "with additional facts concerning the parties' transactional history" in the event the court "find[s] merit in Eurofins' contractual arguments." Dkt. 19, at 10 n.45.

For the reasons below, the court concludes that even without considering the 2017 agreement, Unjury's own allegations about its long-running business relationship with Eurofins preclude Unjury's claim under the DTPA, which will be dismissed with prejudice. The court also concludes that Unjury's negligence claim is barred by Iowa's economic loss doctrine. However, in an abundance of caution, the court will dismiss the negligence claim without prejudice and allow Unjury an opportunity to amend its complaint to allege any additional facts that may affect the outcome of that claim.

A court resolving a motion to dismiss takes all well-pled facts in the complaint as true and draws all reasonable inferences in favor of the non-moving party. *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). The court draws the following facts from Unjury's complaint and the signed, written agreement that Eurofins filed with its motion to dismiss:

## ALLEGED FACTS

### I. The Parties

Plaintiff ProSynthesis Laboratories, Inc., d/b/a Unjury Protein, is a Virginia corporation with its principal place of business in Sterling, Virginia. Jerome Krachenfels and his late wife Martha founded Unjury in 2002. Since that time, Unjury has designed, manufactured, and sold protein products for patients and customers having a range of medical conditions and health goals.

Defendant Eurofins Microbiology Laboratories, Inc. is a Delaware corporation with its principal place of business in Des Moines, Iowa and an office in Madison, Wisconsin. Eurofins is a network of laboratories that tests food for various industries, including the food and pharmaceutical industries.

**II. The Business Relationship**

Unjury alleges that it began a business relationship with Eurofins several years ago, after extensive research and based on Eurofins's representations about the quality and nature of its services, including statements on its website that:

- Eurofins "is the world leader in food, environment, pharmaceutical, and cosmetic product testing" with over 60,000 staff in more than 940 laboratories.

- Eurofins is "committed to provide the highest quality services, accurate results in time, and expert advice by its highly qualified staff."

- "[T]he reliability and accuracy of [Eurofins] data help[s] customers make adequate decisions and meet their increasingly stringent quality and safety standards and the expanding demands of regulatory authorities around the world."

- "Few testing laboratories can combine the level of expertise, technological leadership, attention to quality and customer service that have made Eurofins the global leader in many of the fields where it is active."

- "Large investments in innovation, technology, IT, and logistics . . . ensure that customers enjoy high standards of quality."

- Eurofins's New Berlin, Wisconsin laboratory "serv[es] as a local hub for access to the entire Eurofins network" with "experience with a broad array of food, food ingredients, spices, and raw materials."

Dkt. 1 at ¶¶ 11-12.

3

Unjury alleges that Eurofins made these misrepresentations "to the public, including Unjury's patients and customers within the State of Wisconsin and throughout the world." *Id.* at ¶ 32.[2]

### III. Written Terms and Conditions Signed by Unjury

On January 5, 2017,[3] Krachenfels signed and accepted a "Client Information Form" on behalf of Unjury. The form includes "General Terms and Conditions of Business" for the testing of Unjury's protein powder products. *See* dkt. 12-1. Section 1.1 of the agreement states that it applies to "[a]ll orders accepted by Eurofins Scientific, Inc. or any of its subsidiaries or affiliates (collectively ES)." *Id.* at 1. The agreement includes the following terms related to limitation of liability:

> 9.1 Except to the extent that such limitations are not permitted or void under applicable law: (a) ES (together with its workers, office clerks, employees, representatives, managers, officers, directors, agents and consultants and all ES partners and affiliates, the "ES Indemnifying Parties") shall be liable only for the proven direct and immediate damage caused by the ES Indemnifying Party's willful misconduct in connection with the performance of an order and then, only if ES has received written notice thereof not later than six (6) months after the date of the customer's knowledge of the relevant claim (unless any longer period is prescribed under applicable law and cannot be contractually limited), and (b) in all cases (whether arising under contract, tort, negligence, strict liability, through indemnification or otherwise), the ES Indemnifying Parties' liability per claim or series of related claims, and the customer's exclusive remedy, with respect to ES'

---

[2] The complaint fails to allege when these representations existed on the website, who saw them, and when they saw them. Eurofins says the statements appear on its current website.

[3] The document is dated January 5, 2016, but Krachendels's signature appears alongside a handwritten date of January 5, 2017.

4

> services which fall under these Terms and Conditions, shall be limited to the <u>lesser of</u>: (I) the direct and immediate loss or damage caused by the ES Indemnifying Party's willful misconduct in connection with the performance of the order and (ii) ten times the amount ES actually received from the customer in relation to the order up to fifteen thousand dollars ($15,000).
>
> 9.2    The ES Indemnifying Parties shall not be liable for any indirect, direct or consequential loss or damage (including, but not limited to, loss of business, profits, goodwill, and business opportunities or similar) incurred by the customer or by any third party.
>
> 9.3    It is a condition of ES' acceptance of an order that the customer indemnifies the ES Indemnifying Parties for any losses, injuries, claims and costs which the ES Indemnifying Parties may suffer as a result of arising from or in any way connected with its role under or services or products or software provided pursuant to these Terms and Conditions, except to the extent that the ES Indemnifying Parties are required to bear them according to these Terms and Conditions, and by placing an order the customer agrees to provide that indemnification.
>
> *Id.* at 3-4.

The agreement also provides the following under a section entitled "Disclaimer and Miscellaneous":

> 13.1   ALL TERMS, CONDITIONS, AND WARRANTIES (INCLUDING ANY IMPLIED WARRANTY AS TO THE MANNER, QUALITY AND TIMING OF THE TESTING SERVICE AND RESULTS, EQUIPMENT, PRODUCTS OR SOFTWARE SUPPLIED BY ED ARE EXCLUDED TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE WARRANTIES, OBLIGATIONS AND LIABILITIES OF ES CONTAINED IN THESE TERMS AND CONDITIONS ARE EXCLUSIVE.
>
> 13.2   These Terms and Conditions may be modified in writing from time to time by ES and orders will be governed by the most

5

>recent version of these Terms and Conditions that is in effect at the time ES accepts the order.[4]

>*Id*. at 3.

Finally, § 14.1 of the agreement states that the "construction, validity and performance of these Terms and Conditions" is governed by Iowa law and that "the commercial courts of Des Moines, Polk County, Iowa" shall have exclusive jurisdiction. *Id*.

### IV. Unjury's Product Tests Positive for Salmonella

In the spring of 2022, Unjury was set to release highly anticipated single-serve packets of its savory line of protein powder. In April 2022, Unjury transported samples of two prospective products to Eurofins for standard microbiological pathogen testing as required by the Food and Drug Administration. On April 28, 2022, Eurofins sent the samples to its laboratory facility in New Berlin, Wisconsin and began analyzing them.

On May 2, 2022, Eurofins notified Unjury of a "presumptive positive result" for its chicken soup product, meaning that a pathogen had been detected. Unjury's supply chain director, Robin Jamison-Tiware, immediately called Eurofins to seek more information. Unjury asked about the possibility of inadequate controls at the Eurofins laboratory, but Eurofins dismissed Unjury's concerns.

On May 4, 2022, Eurofins emailed Unjury, stating, "There were no other presumptive/detected samples on the run, the controls were good and there was nothing that flagged our checks on the sample during data valuation." Eurofins suggested that if Unjury

---

[4] The parties do not say whether the 2017 document is the most recent version of Eurofins's terms and conditions, but Unjury does not assert that a more recent or different version exists.

wanted "further investigation, the laboratory can perform an OOS [Out-of-Specification] Report," at Unjury's expense, a test that would not be expected to uncover the source of the presumptive result.

According to Unjury, an OOS result means that the test results did not meet the established applicable criteria.  When an OOS result is obtained, it raises questions about all the testing that has occurred in that laboratory around the same time period.  Industry standards, such as ISO Standard No. 17025, set out recommendations for the procedures that laboratories must follow if the reliability of their sampling is called into question by an OOS result.

On May 6, 2022, Eurofins reported that Unjury's chicken soup product tested positive for Salmonella.  Unjury immediately mounted a robust response to protect its customers.

Senior representatives from Unjury and Eurofins held a telephone conference to discuss Unjury's concerns about the circumstances surrounding the "positive" report.  During the call, Eurofins did not acknowledge any problems at their New Berlin laboratory in response to Unjury's direct questioning.  Eurofins also did not reveal any abnormalities or express an opinion about the reasons for the positive result.

## V.   Further Investigation Reveals Possible Contamination

Eurofins agreed to perform additional sampling and product testing.  It tested five larger composite samples (from 49 individual packets) of the same Unjury product at a different Eurofins laboratory in Louisville, Kentucky. All were negative for Salmonella. Unjury independently engaged another laboratory to test 450 samples from the production batch, combined into 30 composites, and all tested negative for Salmonella.

On May 15, 2022, Unjury emailed additional questions to Eurofins regarding its "presumptive" and "positive" reports. Eurofins responded on May 17, 2022, that six environmental swabs from various locations in the New Berlin laboratory had tested positive for Salmonella during the same week that Unjury's product was tested there. Eurofins also acknowledged having performed genetic testing, and it concluded that one of those environmental swabs matched the Salmonella that Eurofins associated with Unjury's sample.

On June 3, 2022, Eurofins revealed that serotype testing done at its Louisville facility confirmed that the Salmonella species associated with Unjury's sample was Salmonella Senftenberg. On June 14, Eurofins confirmed that Salmonella Senftenberg was identified in its New Berlin laboratory in March 2022, a month before Unjury's chicken soup product sample arrived.

Salmonella Senftenberg is rare in the food industry, particularly in dry powders. Unjury had never received any Salmonella positives in its twenty years of operations, and there were no changes in its manufacturing or handling processes in the period leading to Eurofins's positive report.

On June 16, 2022, Unjury requested that Eurofins review and reconsider its positive report. In a letter dated June 21, 2022, Eurofins changed the chicken soup test report from "positive" to "equivocal." Eurofins also confirmed two additional and previously undisclosed positive environmental test results for Salmonella on April 19, 2022 and May 27, 2022. Specifically, it acknowledged that it had previously identified an OOS result on April 9, 2022. Eurofins also stated in its letter that "when OOS results occur the laboratory performs an investigation to justify the release of samples processed during the time period around the OOS."

## VI. Alleged Damages

Unjury says that it incurred nearly $150,000 in out-of-pocket costs associated with consulting expert fees, additional testing of its product, attempted remediation of the product to ensure safety, additional transportation costs, and attorneys' fees. After the false-positive result, Unjury initiated a remediation process to ensure that its product was safe for consumption by its patients and customers. That process caused deterioration of the product's taste, aroma, and color. Therefore, all of the product Unjury attempted to remediate was rendered unsuitable for sale. Unjury claims it sustained millions in lost profits and lost business opportunities as a result of the delays in its marketing and product launches.

## ANALYSIS

Unjury asserts DTPA and negligence claims against Eurofins under Wisconsin law. Eurofins has moved to dismiss each claim on several grounds. On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the question is whether plaintiff provided defendant with fair notice of its claims and alleged facts plausibly suggesting that it is entitled to relief. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020).

Among other things, Eurofins argues that the parties' past business relationship excludes Unjury as a member of "the public" within the meaning of the DTPA,[5] and that the negligence claim is barred by the limitation of liability provision in the parties' agreement and Iowa's economic loss doctrine. I will discuss the parties' arguments with respect to each claim separately.

---

[5] As discussed below, Eurofins also contends that Unjury fails to state a DTPA claim because it did not identify any misrepresentation that caused its alleged injury.

9

**I. DTPA**

To prevail on a § 100.18 claim, Unjury must allege facts supporting three elements: (1) Eurofins made a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation caused Unjury a pecuniary loss. *Cota v. Ralph Lauren Corp.*, 603 F. Supp. 3d 666, 671 (E.D. Wis. 2022) (citing *Novell v. Migliaccio*, 2008 WI 44, ¶ 44, 309 Wis. 2d 132, 749 N.W.2d 544). Here, Unjury alleges that Eurofins made untrue, deceptive, and misleading representations on its website[6] to the general public about Eurofins's expertise, experience, and service quality, with the intent of inducing potential customers, like Unjury, to use its testing services. Unjury does not allege exactly when it saw the misleading website conduct, stating only that it "had begun its business relationship with Eurofins several years earlier, based on Eurofins' representations about the quality and nature of its services." Dkt. 1 at ¶ 11.

Eurofins contends that Unjury fails to state a claim under this statute for three reasons: (1) Unjury is not a member of "the public" within the meaning of the DTPA; (2) the website content cited by Unjury is mere puffery and does not qualify as a misrepresentation; and (3) the website content has no causal relationship to Unjury's injury in this case. Because the court agrees with Eurofins's first contention, it is not necessary to consider the other two.

As Eurofins notes, Unjury must be a member of the public within the meaning of the DTPA. Unjury does not qualify as a member of "the public" under § 100.18 if Unjury has a "particular relationship" with Eurofins that would "distinguish" Unjury from "the public which the legislature intended to protect." *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007

---

[6] Eurofins says the specific representations quoted by Unjury in its complaint are from its *current* website.

WI 70, ¶¶ 23, 27, 301 Wis. 2d 109, 123-26, 732 N.W.2d 792, 799-800 (internal quotation marks omitted); *Oregon Potato Co. v. Kerry Inc.*, No. 20-cv-92-jdp, 2021 WL 5988432, at *4 (W.D. Wis. Feb. 1, 2021).

The precise meaning of the term "particular relationship" has eluded Wisconsin courts. *Oregon Potato*, 2021 WL 5988432, at *4 (citing *Hinrichs v. DOW Chem. Co.*, 2020 WI 2, ¶ 71, 389 Wis. 2d 669, 701, 937 N.W.2d 37, 53 (declining to further define the term)). The only clear line is that a party is not a member of the public under § 100.18 once it enters into a contract with the defendant. *Id.*; *Kailin v. Armstrong*, 2002 WI App 70, ¶44, 252 Wis. 2d 676, 643 N.W.2d 132. However, this court has held that "if the Wisconsin courts had intended to exclude from the law only contracting parties, [they] could have stated the rule as whether the parties had a 'contracting relationship,' but they have employed the more general language, 'particular relationship.'" *Uniek, Inc. v. Dollar Gen. Corp.*, 474 F. Supp. 2d 1034, 1039 (W.D. Wis. 2007). Following that reasoning, the court in *Uniek* concluded that the plaintiff in that case wasn't a member of the public because the parties "had an ongoing relationship" for 13 years, and the plaintiff had become the defendant's "core picture frame supplier." *Id*.

Here, Unjury alleges both that "Unjury selected Eurofins to test this new batch of product, as it had on *many* prior occasions" and that "Unjury had begun its business relationship with Eurofins *several years earlier*." Dkt. 1, ¶ 11 (emphasis added). In fact, Unjury's president had signed an agreement with Eurofins in 2017. But even if this court disregards this 2017 agreement, Unjury does not qualify as a member of "the public" because it alleges that it had used Eurofins to test its products on many prior occasions for the past several years. As the

11

court stated in *Uniek*, "[i]f this relationship does not distinguish plaintiff from the public, then virtually nothing would." 474 F. Supp. 2d at 1040 (internal quotation marks omitted).

Unjury cites decisions from this court and the Wisconsin Supreme Court for the proposition that a plaintiff may qualify as a member of the public even it had a prior dealing with the defendant. *La Crosse Cnty. v. Trinity Indus., Inc.*, No. 15-cv-117-jdp, 2016 WL 1274623, at *9 (W.D. Wis. Mar. 31, 2016) ("Trinity does not identify authority to support a blanket rule that once two parties have entered into a contract, they forever have a 'particular relationship' that would preclude claims under § 100.18."); *K & S Tool & Die,* 2007 WI 70. But the plaintiffs in both of those cases had made only one discreet purchase from the defendant before the alleged misrepresentation. *See La Crosse Cnty.,* 2016 WL 1274623, at *8-9 (plaintiff allegedly purchased one specific product from defendant in 2011, before defendant allegedly made misrepresentations about *different* product in 2012 and 2014); *K & S Tool & Die Corp.*, 2007 WI 70, ¶ 32 (plaintiff made one purchase from defendant several years before alleged misrepresentation).

These cases provide little guidance in the instant case, in which Unjury reports that Eurofins had performed similar testing on Unjury's protein products on many prior occasions over several years prior to the 2022 incident at issue in this case. *See Oregon Potato*, 2021 WL 5988432, at * 4 (finding similar where plaintiff alleged decade-long relationship with defendant). In addition, Unjury alleges that it relied on Eurofins' representations about the quality and

nature of its services when it first entered into business with Eurofins, which according to Unjury, occurred "several years" before the incident in question.[7]

Unjury also points out that courts have treated a party's status as a member of the public as a question of fact. *See, e.g., La Crosse Cnty.*, 2016 WL 1274623, at *9 ("Under the standards for reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court cannot definitively conclude that La Crosse County was not a member of the public."); *Roundy's Supermarkets, Inc. v. Nash-Finch Co.*, No. 08-cv-142, 2008 WL 5377907, at *3 (E.D. Wis. Dec. 23, 2008) (similar). But that does not mean that this determination is immune from judicial scrutiny. In *Kailin, Uniek*, and *Oregon Potato*, the courts determined as a matter of law that the plaintiff was not a member of the public. "[C]ourts agree [that the question whether a plaintiff is a member of the public] can be decided by the Court where the undisputed facts establish that plaintiff had a particular relationship with the defendant." *In re C2R Glob. Mfg., Inc.*, 617 B.R. 618, 624 (Bankr. E.D. Wis. 2020) (citing *Bates v. Wisconsin Dep't of Workforce Dev.*, 636 F. Supp. 2d 797, 811 (W.D. Wis. 2009), *aff'd*, 375 Fed. Appx. 633 (7th Cir. 2010)). In this case, Unjury's complaint acknowledges Unjury's long-running business relationship with Eurofins. Accordingly, the court will grant Eurofins's motion to dismiss Unjury's § 100.18 claim.

---

[7] Although neither party raises the issue, it is important to note that § 100.18 has a three-year statute of limitations. Wis. Stat. § 100.18(11)(b)(3); *La Crosse Cnty.*, 2016 WL 1274623, at *8. Because Unjury filed its complaint on November 14, 2022, its DTPA claim would have had to be based on misrepresentations that occurred on or after November 14, 2019.

## II. Negligence

Unjury contends that Eurofins is liable for negligence because it breached its duty to conduct product testing with reasonable care and it acted with reckless disregard of Unjury's rights and interests. Specifically, Unjury alleges that Eurofins failed to maintain a sanitary testing environment, intentionally sent Unjury's products for testing in a laboratory known to be contaminated, and then hid these facts from Unjury as it tried to investigate the situation.

Seeking dismissal, Eurofins argues that Unjury cannot state a claim for negligence because the claim is barred by the limitation of liability provision in the parties' agreement and the economic loss doctrine. Because the court agrees that the economic loss doctrine precludes Unjury's negligence claim, it is not necessary to consider the parties' arguments with respect to the agreement's limitations on liability.

The economic loss doctrine, which bars recovery in negligence when the plaintiff has suffered only economic loss, is recognized in both Wisconsin and Iowa. *See Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011); *Kaloti Enters., Inc. v.. Kellogg Sales Co.*, 2005 WI 111, ¶ 30, 283 Wis.2d 555, 699 N.W.2d 205. While Wisconsin does not apply the doctrine to any contract for services, *see Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 2, 276 Wis.2d 361, 365-66, 688 N.W.2d 462, 464, Iowa has carved out an exception only with respect to certain professional services, *see Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 504 (Iowa 2011) (noting exception for professional negligence claims against attorneys and accountants).

The parties appear to agree that the provision of laboratory testing is a service, so the economic loss doctrine comes into play only if Iowa law applies. Therefore, the court must delve into the choice of law question—including the agreement's governing law provision—and the

14

parties' dispute about whether Unjury's claim falls within Iowa's exception for professional negligence. I will address each of these issues in turn.

### A. Governing Law

A court sitting in diversity applies the choice-of-law rules of the forum state to determine which state's substantive law applies to the plaintiffs' claims. *See Paulsen v. Abbott Labs.*, 39 F.4th 473, 477 (7th Cir. 2022); *Atl. Cas. Ins. Co. v. Garcia*, 878 F.3d 566, 569 (7th Cir. 2017). Under Wisconsin's choice-of-law rules, there is a presumption that the law of the forum state applies unless non-forum contacts are more significant. *Drinkwater v. Am. Fam. Mut. Ins. Co.*, 2006 WI 56, ¶ 40, 290 Wis. 2d 642, 658, 714 N.W.2d 568, 576. However, Wisconsin courts will enforce the parties' express agreement that the law of a particular jurisdiction shall control their contractual relations, provided there are no public policy reasons to disregard them. *Bush v. National Sch. Studios, Inc.*, 139 Wis.2d 635, 642, 407 N.W.2d 883 (1987).

Here, Eurofins has produced a written agreement that Unjury's president signed in 2017. Section 14.1 of that agreement states that the construction, validity, and performance of the terms and conditions contained within it are governed by Iowa law.[8] Unjury does not deny that it entered an agreement or challenge the validity of § 14.1, but it points out that Eurofins has not shown that Eurofins Microbiology Laboratories was a contracting party because the document names only "Eurofins Scientific, Inc."

As Eurofins argues, however, § 1.1 of the agreement clearly states that it applies to all Eurofins subsidiaries or affiliates. Eurofins's corporate disclosure statement, dkt. 11, identifies

---

[8] Neither party addresses the forum selection clause, so the court will not do so either.

its immediate parent company as Eurofins Food Testing US Holdings, Inc., which is also the immediate parent of Eurofins Scientific, Inc., making the named defendant in this case an affiliate of the corporate entity identified in the 2017 agreement. Further, Eurofins's website—on which Unjury relies for purposes of its DTPA claim—identifies Eurofins Scientific, Inc. and Eurofins Microbiology Laboratories, Inc. as entities within the food and feed testing group. *See* "Eurofins' Group Directory" at https://www.eurofins.com/media-centre; and defendant's webpage at www.eurofins.com/food-testing/us-food-locations/milwaukee-wi-eurofins-microbiology-laboratory. Eurofins also says that it can easily provide additional corporate documentation to establish its affiliation with Eurofins Scientific, but the court finds the above publically-available information sufficient for this purpose.[9]

Unjury does not dispute Eurofins's contention that if the agreement applies to the parties' dispute in this case, then its negligence claim is governed by Iowa's economic loss doctrine. *See ERA Franchise Systems, LLC v. Hoppens Realty, Inc.*, No. 12-cv-594-slc, 2013 WL 3967869, at *8-9 (W.D. Wis. July 31, 2013) (applying governing law provision of parties' service contract to economic loss doctrine). Instead, what the parties dispute is whether their contract for laboratory testing constitutes a professional service that falls within the narrow exception to Iowa's economic loss doctrine. *See* Pltf.'s Br., dkt. 19, at 5 and 7 (arguing Iowa law in the alternative).

---

[9] In any event, as discussed below, because the court is providing Unjury with the opportunity to amend its complaint, the court also will permit Eurofins to submit further proof of its affiliation with Eurofins Scientific.

### B. Professional Negligence Exception

The parties agree that Iowa has carved out an exception to the economic loss doctrine for some types of professional negligence. The Iowa Supreme Court has held that "purely economic losses are recoverable in actions asserting claims of professional negligence against attorneys and accountants." *See Annett Holdings,* 801 N.W.2d at 504 (citing *Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 693 (Iowa 2010)). In addition, federal courts have not applied the economic loss rule to licensed architects or engineers. *See Floyd Cnty. Bd. of Supervisors v. Prochaska & Assocs., Inc.*, No. 21-cv-2043, 2022 WL 19000605, at *10 (N.D. Iowa Nov. 30, 2022) (citing *Penford Prods. Co. v. Schneider Structural Eng'g, Inc.*, No. 09-cv-00037, 2010 WL 11469649, at *2 (N.D. Iowa Sept. 3, 2010); *Burns Philp Inc. v. Cox, Kliewer & Co.*, No. 99-cv-90033, 2000 WL 33361992, at *8 (S.D. Iowa Nov. 2, 2000)); *John T. Jones Const. Co. v. Hoot Gen. Const.*, 543 F. Supp. 2d 982, 1009 (S.D. Iowa 2008), *aff'd*, 613 F.3d 778 (8th Cir. 2010) (design engineer who drafted plans and specifications and supervised construction).

Unjury contends that this exception should apply in this case because "Unjury engaged Eurofins to benefit from its scientific and technical expertise and laboratory services." Dkt. 19, at 7. However, Unjury does not appear to be asserting a professional negligence claim and has cited no authority for extending the limited exception identified by Iowa courts to a laboratory testing facility. *See Audio Odyssey, Ltd. v. United States*, 243 F. Supp. 2d 951, 962 (S.D. Iowa 2003), *aff'd*, 373 F.3d 870 (8th Cir. 2004) (refusing to extend exception to loan guaranty made by Small Business Administration). Nor is Eurofins akin to the licensed professionals (architects and engineers) in the federal cases cited above.

Unjury drops a footnote in its response brief, requesting leave to amend its complaint with additional facts concerning the parties' transactional history in the event that the court finds merit in Eurofins's contractual arguments. Dkt. 19, at 10 n.45. Unjury does not say what additional facts it may possess about its transactional history with Eurofins that would save its negligence claim. However, § 13.2 of the agreement provides that it will be governed by the most recent version of the terms and conditions in effect at the time an order is accepted. Because there is a remote possibility that other terms and conditions could apply to the 2022 incident in this case, I will dismiss the negligence claim without prejudice.

Unjury may have until June 9, 2023, to file an amended complaint, but only with respect to the negligence claim. If Unjury files an amended complaint, then Eurofins may file a responsive pleading or move to dismiss the amended complaint, incorporating any previously-made arguments by reference. At that time, Eurofins also may submit any information on its affiliation with Eurofins Scientific that is available in the public record or of which the court may otherwise take judicial notice without having to convert the motion to one for summary judgment under Rule 56.

**ORDER**

IT IS ORDERED that

1. Defendant Eurofins Microbiology Laboratories, Inc.'s motion to dismiss, dkt. 9, is GRANTED to the following extent:

    a. Plaintiff Prosynthesis Laboratories, Inc.'s claim under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, is DISMISSED WITH PREJUDICE.

    b. Plaintiff's negligence claim is DISMISSED WITHOUT PREJUDICE.

2. Plaintiff is GRANTED leave to amend its complaint with respect to its negligence claim, to allege additional facts concerning the parties' transactional history. Plaintiff shall have until June 9, 2023, to file an amended complaint.

Entered this 11th day of May, 2023.

                                      BY THE COURT:

                                      /s/

                                      _____
                                      STEPHEN L. CROCKER
                                      Magistrate Judge